UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

KEVIN HAMPTON,                          )
                                        )
            Plaintiff,                  )
                                        )
    vs.                                 )           1:08-cv-563-SEB-DML
                                        )
UNITED PARCEL SERVICE, INC.,            )
                                        )
            Defendant.                  )


**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**


This cause is before the Court on Defendant's Motion for Summary Judgment

[Docket No. 34], filed on April 30, 2009, pursuant to Federal Rule of Civil Procedure 56.

Plaintiff, Kevin Hampton, brings this claim against his employer, Defendant, United

Parcel Service, Inc. ("UPS"), for allegedly retaliating against him for engaging in

protected activity, in violation of Title VII of the Civil Rights Act of 1964, as amended,

42 U.S.C. § 2000e *et seq*.[1]  For the reasons detailed in this entry, we <u>GRANT</u> Defendant's

Motion for Summary Judgment.


**<u>Factual Background</u>**

In 1984, Mr. Hampton, a male, began working for UPS in a part-time, hourly

---

[1] In his complaint, Plaintiff also alleged a Title VII discrimination claim.  However, in his
responsive briefing on this motion, he waived this claim.  Accordingly, we <u>GRANT</u> Defendant's
Motion for Summary Judgment as to Plaintiff's Title VII discrimination claim.

position at its 16th Street facility in Indianapolis, Indiana.  In 1986, Mr. Hampton was

promoted to a management position at that same location, where he currently remains

working as a part-time supervisor for UPS.  At all times relevant to this lawsuit (2006

through 2008), Mr. Hampton was employed as a part-time supervisor in UPS's Circle

Center air operation located in its 16th Street facility.

Mr. Hampton is responsible for supervising ten to twelve "air drivers," who drive

UPS's brown package cars and are responsible for the pick-up of air packages (e.g., Next

Day Air, Second Day Air) at drop boxes and other locations.  Air drivers then return the

packages to the UPS facility so they can be unloaded, sorted, and loaded onto the correct

trailer for delivery to the airport or other appropriate location.  Air packages must be

delivered by a specified date and/or time, and if the commitment date or time is not met,

UPS may be required to refund the customer's money.  Thus, the delivery of these

packages is a highly time sensitive operation.  In order to enable UPS to meet its delivery

deadlines, the 16th Street facility operates nearly twenty-four hours per day, Monday

through Saturday.  Mr. Hampton has worked various shifts throughout his years with

UPS.  He currently works 5:15 p.m. to 11:15 p.m.; in the past, he has worked the 3:30

a.m. to 8:30 a.m. shift.

At all times relevant to this lawsuit, Division Manager, Ginger Golobish,

supervised the Center Manager, Paul Odendahl.  Mr. Odendahl, in turn, supervised a full-

time supervisor who was the direct superior of Mr. Hampton.

*Plaintiff's Allegations of Battery by Supervisor*

On November 20, 2006, Mr. Hampton arrived on time for his evening shift and learned that Curtis Hensley, another UPS employee, was not at work.  Because Mr. Hensley was gone, Mr. Hampton had to prepare the DIAD boards, a job that Mr. Hensley usually performed.[2]  The DIAD boards are a necessary piece of equipment for drivers which must be prepared and ready before drivers can leave a UPS facility to begin their routes.  Mr. Hampton was working on the DIAD boards when Division Manager Ginger Golobish walked by, noticed that Mr. Hampton's drivers were not preparing to leave on their routes, and directed Mr. Hampton to get his drivers out on the road.  According to Mr. Hampton, he started to inform Ms. Golobish of the problem with the DIAD boards, but she interrupted and cut him off before he had an opportunity to finish explaining the issue.

Mr. Hampton contends that Ms. Golobish then went to the door, held it open for him, and began speaking to another driver outside of the office.  At that point, Mr. Hampton turned around to speak to one of his drivers, Brandon Palmer, who had approached him to discuss the problem with the DIAD boards.  Mr. Hampton maintains that, about thirty seconds later, Ms. Golobish came back through the door, grabbed him by the arm, and said, "Get out here."  Hampton Dep. at 43.  Mr. Hampton testified in his

---

[2] Mr. Hampton testified by deposition that, normally, when he knew in advance that Mr. Hensley was going to be off, he (Hampton) would arrive approximately twenty minutes early to make sure that he had time to prepare the DIAD boards.  However, because he had not received advanced notice that Mr. Hensley would be absent on November 20, 2006, Mr. Hampton did not come in early that day.  Hampton Dep. at 39-40.

deposition that Ms. Golobish then "jerked" his arm toward the door, causing him to lose his balance and have to grab the counter to steady himself.  According to Mr. Hampton, they stood facing each other for a few seconds with Ms. Golobish still pulling on Mr. Hampton's arm, allegedly in an attempt to pull him out the door, before Ms. Golobish let go and left the room.  Id. at 43-46.

Ms. Golobish denies touching Mr. Hampton.  She testified by deposition that she came into the room where Mr. Hampton was talking with Mr. Palmer, told Mr. Hampton to get his drivers on the road, and that "[h]e went out and did."  Golobish Dep. at 24-26.  According to Ms. Golobish, that was the extent of their exchange.  Although Mr. Hampton's arm had no visible mark or bruise following the encounter, he claims that he experienced pain in his arm and shoulder for a few days after the incident.  Hampton Dep. at 48, 123-24.  In addition to Mr. Hampton, Ms. Golobish, and Mr. Palmer, two other UPS employees, Kim Muncie and Crystal Jones, were also in the room at the time the alleged altercation occurred.  Id. at 49.

***Plaintiff's Complaints to Defendant***

A few minutes after the incident, Center Manager Paul Odendahl approached Mr. Hampton and told him that Ms. Golobish wanted to see both of them in her office.  According to Mr. Hampton, he assumed Ms. Golobish was going to discuss the altercation, so as Mr. Hampton and Mr. Odendahl walked to her office, Mr. Hampton gave a quick account of the events that had just transpired.  Mr. Odendahl allegedly

responded, "Oh, no, that ain't good."  Hampton Dep. at 52.  When they arrived at Ms.

Golobish's office, however, she made no mention of the incident and instead addressed

an issue that had arisen with the pay rate of one of Mr. Hampton's drivers.  There was no

further discussion of the exchange that had occurred between Mr. Hampton and Ms.

Golobish for the rest of the day.

Two days later, on Wednesday, November 22, 2006, Mr. Hampton again spoke

with Mr. Odendahl and stated that he had not yet decided whether he was going to ignore

the incident with Ms. Golobish or report it.  Mr. Odendahl expressed no opinion one way

or the other, but merely told Mr. Hampton to think it over during the Thanksgiving

holiday and that, before deciding to report it, he (Hampton) should be sure he was "ready

for the game that will ensue."  Hampton Dep. at 64.  Mr. Hampton testified by deposition

that he understood "the game" to mean that he could expect retaliation from Ms. Golobish

if he reported her conduct.  Id.  Mr. Odendahl did not explain what he meant by that term

or otherwise elaborate, however.

On Friday, November 24, 2006, Mr. Hampton spoke with Mr. Odendahl a third

time and stated that he had decided to make a report to the corporate hotline.  Mr.

Odendahl advised him that, if he was going to report it, he should skip the corporate route

and instead contact directly Jim Lewis, the Indiana District Human Resources Manager,

because Mr. Lewis was the individual who dealt with such complaints.  Thus, on the

following Monday, November 27, 2006, Mr. Hampton met with Mr. Lewis.  At that

meeting, Mr. Hampton recounted the events of November 20, 2006, explaining that the

incident escalated from a verbal to a physical assault,[3] and demonstrating what Ms. Golobish allegedly did to his arm.  Mr. Hampton also reported that his communications with Ms. Golobish were often heated and hostile.  Mr. Hampton stated that he was unsure why Ms. Golobish was hostile toward him, but speculated that she might believe that anyone who had been a part-time supervisor for as long as he had been without being promoted was "a loser."  Hampton Dep. at 76.

When Mr. Hampton finished his story, Mr. Lewis asked him what kind of resolution of the matter he wanted.  According to Mr. Hampton, Mr. Lewis stated that he would not terminate Ms. Golobish but that he could get her to apologize to Mr. Hampton. Mr. Hampton testified that he became "very angry" and "agitated" and told Mr. Lewis that, had Ms. Golobish seen him (Hampton) grab one of his female employees and jerk her by the arm, he would have immediately been terminated, and that the company needed to fairly apply its zero-tolerance policy for workplace violence.  Id. at 96, 110. Mr. Lewis allegedly replied, "Well, be that as it may, what I would like to focus on is to move forward from here."  Id. at 147.  Shortly after speaking with Mr. Hampton, Mr. Lewis questioned Ms. Golobish regarding the alleged incident and she denied his physical assault claim.

A few days after Mr. Hampton met with Mr. Lewis, he became frustrated because

---

[3] Mr. Hampton testified by deposition that, between the time when the incident occurred and when he met with Mr. Lewis, he (Hampton) had spoken with two different police officers, both of whom allegedly informed him that Ms. Golobish's conduct constituted assault under Indiana law.  Hampton Dep. at 71-72.

two of his witnesses had not yet been interviewed.[4]  Before speaking with Mr. Lewis or

determining why no progress had been made on the investigation into his allegations, Mr.

Hampton called the police and reported that Ms. Golobish had assaulted him.  According

to Mr. Hampton, he knew that Ms. Golobish would not be arrested because the alleged

offense was too minor, but he still called the police because he wanted "to get corporate's

attention that something serious had happened."  Hampton Dep. at 132.

That same day, Mr. Hampton also called UPS's corporate hotline and reported Ms.

Golobish's conduct.  According to the UPS compliance report summarizing his

complaint, Mr. Hampton stated that "Ms. Golobish went into a 'rage' and yelled, "I said

get out here" and grabbed his right arm and jerked him roughly to the door in an attempt

to pull him out of his office."  Hampton Dep. Exh. 5.  The report states that Mr. Hampton

requested that the incident be investigated and that Ms. Golobish be terminated in

accordance with UPS's zero tolerance policy for workplace violence.  Id.  Although not

included in the compliance report, Mr. Hampton contends that he also stated that he

would have been fired if he had acted in the same manner toward a female employee as

Ms. Golobish had acted toward him.  Hampton Dep. at 121-22.

***Defendant's Investigation of Plaintiff's Allegations***

---

[4] Mr. Lewis testified in his deposition that the reason he had not yet interviewed all of the
witnesses was that he was conducting the investigation immediately after Thanksgiving, when
UPS was in its peak, high volume season.  Because of the high volume, Mr. Lewis was working
without his supervisors, who were on special assignments.  Lewis Dep. at 26-27.

Shortly after his initial conversation with Mr. Hampton on November 27, 2006, Mr. Lewis interviewed Ms. Golobish about the incident.  According to Mr. Lewis, she admitted raising her voice at Mr. Hampton, but denied that she physically assaulted him.[5] Lewis Dep. at 27-28, 34-35.  Mr. Lewis spoke with Mr. Odendahl as well, who provided a statement regarding his conversations with Mr. Hampton.  Id. at 16-18.  As part of his investigation, Mr. Lewis also interviewed Crystal Jones, Kim Muncie, and Brandon Palmer, the three other UPS employees who had been present in the office when the exchange between Mr. Hampton and Ms. Golobish occurred.  These interviews were conducted on December 4 and 5, 2006.

Ms. Muncie told Mr. Lewis that she had not seen anything that would either corroborate or refute Mr. Hampton's allegations.  Ms. Jones stated that she did not see any physical contact between Ms. Golobish and Mr. Hampton, but that Ms. Golobish had spoken to Mr. Hampton in an aggressive, though not unprofessional, manner.  Mr. Palmer reported that he had seen Ms. Golobish grab Mr. Hampton and described Ms. Golobish's communication as intense but not unprofessional.  According to Mr. Lewis, when asked to elaborate, Mr. Palmer could not determine whether Ms. Golobish merely touched Mr. Hampton on the arm or grabbed him, as Mr. Hampton claimed, in a physically aggressive manner.[6]  Id. at 33-34, 41-42; Lewis Decl. ¶¶ 8-9.  However, Mr. Palmer testified by

---

[5] In her deposition, Ms. Golobish testified that she neither raised her voice nor touched Mr. Hampton.  Golobish Dep. at 25-27.

[6] On July 1, 2009, Plaintiff filed a Motion to Strike [Docket No. 45] Paragraphs 34-36 of
(continued...)

affidavit that Mr. Lewis attempted to persuade him to change his account of what had

occurred, but that what he (Palmer) really saw was Ms. Golobish "grab [Mr. Hampton's]

arm and yank him toward the door."  Id. ¶¶ 7, 9.


***Defendant's Anti-Harassment and Anti-Violence Policies***

UPS's Professional Conduct and Anti-Harassment Policy prohibits, *inter alia*,

"unwanted physical contact, including horseplay, touching, interference with an

individual's normal work movement, or assault."  Lewis Decl. Exh. 1.  The policy further

provides that: "UPS will take immediate and appropriate corrective action whenever it

determines that a violation of a policy has occurred.  Any employee who violates this

policy may be subject to termination or other disciplinary action."  Id.

The company's Workplace Violence Prevention Policy "prohibits physical assaults

(fights), threatening comments, intimidation . . . and [a]ny comments or behavior that

reasonably could be interpreted as an intent to do harm to employees."  Lewis Decl. Exh.

2.  The policy provides that violations "will be dealt with through disciplinary action

which may include, but is not limited to, suspension or termination of employment."  Id.

---

[6](...continued)
Defendant's Memorandum of Law in Support of Motion for Summary Judgment as hearsay.
The disputed paragraphs are based on the declaration and deposition testimony of Mr. Lewis
regarding what Ms. Muncie, Ms. Jones, and Mr. Palmer told him about the incident.  However,
as Defendant maintains, the disputed statements are admissible insofar as this evidence is not
being presented for the truth of the matter, but to show Mr. Lewis's state of mind at the time he
made his disciplinary decisions.  See Fed. R. Evid. 803(3).  We believe it is also relevant to
demonstrate the nature and extent of UPS's response to Mr. Hampton's allegations.
Accordingly, for this reason, we hereby DENY Plaintiff's Motion to Strike.

Mr. Lewis testified by deposition that "zero tolerance" means "that in every situation or occurrence, incident, that's brought to our attention, that we will investigate it, every single – every instance that's brought to our attention . . . [a]nd take the appropriate action."  Lewis Dep. at 9.

### Resolution of Plaintiff's Complaint

Mr. Lewis testified by declaration that, based on the interviews, the most that he could confirm regarding the incident was that Ms. Golobish had, at least, touched Mr. Hampton while instructing him to get his drivers on the road.  Based on this fact, Mr. Lewis concluded that the appropriate measure to take was to review the Professional Conduct policy with Ms. Golobish and counsel her that it was unacceptable to put her hands on a subordinate in the workplace.  Lewis Decl. ¶¶ 11, 13.  Mr. Hampton concedes that Ms. Golobish has not touched him or been physically aggressive toward him in any other way since she received this counseling.  Hampton Dep. at 146.

Mr. Lewis also met with Ms. Golobish and Mr. Hampton together in an attempt to clear the air between them.  At the conclusion of the meeting, Mr. Lewis read out loud UPS's policy prohibiting retaliation and advised Ms. Golobish that Mr. Hampton should not be subjected to retaliation as a result of his report regarding her conduct.  Id. at 143-44; Lewis Decl. ¶ 14.

### Plaintiff's Shift Change

In March 2007, a technician, who had for a number of years handled the 16th Street facility's air operation on Saturdays, transferred to another state. Ms. Golobish testified by deposition that, because of growth in the Saturday air operation, UPS needed an additional management employee, rather than a technician, to work Saturdays. Additionally, she believed that the employee needed to have Vehicle Safety Training ("VSTA") so that the employee could respond in case a driver had an emergency on the road. Only management employees who have VSTA are allowed to train drivers, respond to an accident, or take over for a driver who is unable to complete his or her route. Golobish Dep. at 39-41. According to Ms. Golobish, she chose Mr. Hampton to replace the technician on the Tuesday to Saturday shift[7] because he (Hampton) was the only part-time supervisor in the 16th Street facility air operation with VSTA training.[8] Mr. Hampton's pay was not altered as a result of the shift change. Ms. Golobish also assigned full-time specialist Trevor Dunica to Saturdays because he also had VSTA. Id. at 36, 38, 43-44.

On March 31, 2007, Mr. Hampton was assigned to work the Saturday evening shift. Thus, once he moved to the Tuesday through Saturday schedule, he worked both

---

[7] Up to that point, Mr. Hampton had always worked a Monday through Friday schedule.

[8] Mr. Hampton contends that the Center Manager, Mr. Odendahl, never told him that VSTA was one of the reasons he was assigned to work Saturdays. Hampton Dep. at 167. Neither the employee Mr. Hampton replaced nor the employee who ultimately replaced Mr. Hampton on the Saturday evening shift had VSTA. Hensley Aff. ¶¶ 6-8.

Friday and Saturday nights, and was the only part-time supervisor required to do so.[9]  Mr. Hampton was upset about working on Saturdays for a number of reasons.  He contends that the Saturday night shift interfered with another part-time job he held as a substitute school bus driver and that it also conflicted with work he performed for his church. Being required to work both weekend nights interfered with his family life as well.  Mr. Hampton also testified that the tasks he was assigned on Saturdays were menial and unrelated to his skills and training.  For example, Mr. Hampton could not complete safety rides on the evening shift because the drivers were already out on the road by the time he arrived.  His list of duties was almost identical to the list the security guard was assigned and included such tasks as checking exterior doors to ensure they were locked, checking the backs of trailers, and starting the building lockdown.  Finally, even though he worked the Saturday shift, Mr. Hampton still received telephone calls at home on Mondays from the drivers he supervised with questions that Mr. Hampton's Monday replacement (who was a technician, not a supervisor) was unable to answer.

Ms. Golobish did not make the decision regarding whether Mr. Hampton worked the day shift or the evening shift on Saturdays.  That decision was made by Center Manager Kevin Fath and the full-time supervisor to whom Mr. Hampton reported on Saturdays.  Initially, Mr. Fath allowed Mr. Hampton to work the Saturday morning shift

---

[9] However, both the employee who worked the Saturday shift before Mr. Hampton was assigned Saturdays and Curtis Hensley, the employee who took the Saturday shift after Mr. Hampton worked that time slot, worked both Friday and Saturday nights.  Neither of those employees was a part-time supervisor.

when he (Hampton) had evening commitments.  However, Mr. Hampton contends that it

seemed important to Ms. Golobish that Mr. Hampton work nights and, although Mr. Fath

said that he did not have to run his decisions by Ms. Golobish, within about a month, Mr.

Hampton was told he would no longer be allowed to work Saturday mornings.  According

to Mr. Hampton, when Mr. Fath attempted to change the schedule to allow Mr. Hampton

to have Friday night off, Ms. Golobish blocked the change.

Mr. Hampton remained on the Tuesday-through-Saturday schedule until

September 2008, when he was returned to a Monday-through-Friday shift.  The new

Division Manager at that time, Tina Garber, made the decision to replace Mr. Hampton

on Saturdays with Curtis Hensley.  Mr. Hensley did not have VSTA, but UPS was able to

obtain the necessary VSTA coverage because full-time supervisor John Solomon began

working Saturdays in 2008 and possessed the required training.  According to Mr.

Hampton, however, the addition of Mr. Solomon's working Saturdays actually made no

difference because all full-time supervisors have VSTA training and there were full-time

supervisors working Saturdays when Mr. Hampton was assigned the Saturday night shift.

***Plaintiff's Vacation Time***

Mr. Hampton also alleges that, on two occasions, UPS forced him to change his

vacation weeks to accommodate other employees' vacations.  Mr. Hampton does not

claim that he lost any vacation time, only that he suffered the inconvenience of being

asked to alter the weeks that he took vacation time.  In January or February 2007, when

management employees were picking their vacation days for 2007, Mr. Odendahl sent an email to Mr. Hampton, Gus Powell, Andrew Heilman, and Rachelle Guess, informing them that, because two management employees could not be on vacation the same week, they would have to choose different vacation weeks in order to avoid a conflict. According to Mr. Hampton, prior to his having lodged a complaint against Ms. Golobish, this rule had never been publicized or enforced.  Although Mr. Hampton maintains that he is personally aware of situations in which more than one technician or supervisor was on vacation during the same week, he concedes that he is unable to identify anyone in his center who was allowed to take vacation the same week as another management person.

In July 2007, Mr. Hampton was asked to reschedule one of his vacation weeks after Mr. Heilman, a full-time supervisor, had been transferred into Mr. Hampton's division.  While in his previous location, Mr. Heilman had requested the same vacation week that Mr. Hampton had previously requested.  According to Mr. Odendahl, he had been informed that Mr. Heilman had already purchased a cruise and plane tickets for that week and was unaware that Mr. Hampton had made any similar commitments for the dates in question, so Mr. Odendahl asked Mr. Hampton to move his vacation to a different week.  Mr. Hampton stated that he did not care that Mr. Heilman was his supervisor and had more seniority, he (Hampton) was not changing his vacation.  Mr. Odendahl then allowed Mr. Hampton to take his vacation week as scheduled.  Mr. Hampton also claims that Mr. Odendahl required him to reschedule a week of vacation in the fall of 2008.

14

***The Instant Litigation***

On May 23, 2007, Mr. Hampton filed a Charge of Discrimination with the Equal

Employment Opportunity Commission ("EEOC"), alleging sex discrimination and

retaliation in violation of Title VII.[10]  He subsequently received his Dismissal and Notice

of Rights and then timely filed this action on April 29, 2008.

## Legal Analysis

### I.   Standard of Review

Summary judgment is appropriate when the record shows that there is "no genuine

issue as to any material fact and that the moving party is entitled to a judgment as a matter

of law."  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

Disputes concerning material facts are genuine where the evidence is such that a

reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248 (1986).  In deciding whether genuine issues of material

fact exist, the court construes all facts in a light most favorable to the non-moving party

and draws all reasonable inferences in favor of the non-moving party.  See id. at 255.

However, neither the "mere existence of some alleged factual dispute between the

parties," id., 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the

material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586

_____

[10] As explained in Footnote 1, the sex discrimination claim has been withdrawn.

(1986), will defeat a motion for summary judgment.  Michas v. Health Cost Controls of Ill., Inc., 209 F.3d 687, 692 (7th Cir. 2000).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  Celotex, 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case.  Id. at 325.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes.  Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994).  Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate.  See Shields Enterprises, Inc. v. First Chicago Corp., 975 F.2d 1290, 1294 (7th Cir. 1992); Wolf v. City of Fitchburg, 870 F.2d 1327, 1330 (7th Cir. 1989).  But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated.  See Celotex, 477 U.S. at 322; Ziliak v. AstraZeneca LP, 324 F.3d 518, 520 (7th Cir. 2003).   Further, a failure to prove one essential element "necessarily renders all other facts immaterial."  Celotex, 477 U.S. at 323.

A plaintiff's self-serving statements, which are speculative or which lack a

foundation of personal knowledge, and which are unsupported by specific concrete facts reflected in the record, cannot preclude summary judgment.  Albiero v. City of Kankakee, 246 F.3d 927, 933 (7th Cir. 2001); Stagman v. Ryan, 176 F.3d 986, 995 (7th Cir. 1999); Slowiak v. Land O'Lakes, Inc., 987 F.2d 1293, 1295 (7th Cir. 1993).

The summary judgment standard is applied rigorously in employment discrimination cases, because intent and credibility are such critical issues and direct evidence is rarely available.  Seener v. Northcentral Technical Coll., 113 F.3d 750, 757 (7th Cir. 1997); Wohl v. Spectrum Mfg., Inc., 94 F.3d 353, 354 (7th Cir. 1996).  To that end, we carefully review affidavits and depositions for circumstantial evidence which, if believed, would demonstrate discrimination.  However, the Seventh Circuit has also made clear that employment discrimination cases are not governed by a separate set of rules, and thus remain amenable to disposition by summary judgment so long as there is no genuine dispute as to the material facts.  Giannopoulos v. Brach & Brock Confections, Inc., 109 F.3d 406, 410 (7th Cir. 1997).

## II.     Discussion

Under Title VII, it is unlawful "for an employer to discriminate against any of [its] employees ... because [the employee] has opposed any practice made an unlawful employment practice by [Title VII]."  42 U.S.C. § 2000e-3(a).  A plaintiff has two methods of proof available to him to demonstrate retaliation.  A plaintiff may prove retaliation either through the direct method of proof or the indirect method, also called the

"burden-shifting" method.  See Tomanovich v. City of Indianapolis and Indiana Dep't of Transp., 457 F.3d 656, 662 (7th Cir. 2006) (citing Moser v. Ind. Dep't of Corr., 406 F.3d 895, 903 (7th Cir. 2005)).  It appears from his briefing that Mr. Hampton is proceeding solely under the direct framework, so we shall follow his lead and address only that analysis.  Under the direct approach, a plaintiff must present sufficient evidence to demonstrate that he opposed an unlawful employment practice, that he suffered an adverse employment action, and that there is a causal connection between the two. Haywood v. Lucent Techs., Inc., 323 F.3d 524, 531 (7th Cir. 2003).

A plaintiff can use either direct or circumstantial evidence to meet this burden. Direct evidence of retaliation is rare and typically requires an admission of discriminatory animus.  Long v. Teachers' Retirement Sys. of Ill., 585 F.3d 344, 350 (7th Cir. 2009) (citations omitted).  However, a plaintiff can also demonstrate the necessary causal link by "constructing a convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker."  Ridings v. Riverside Med. Ctr., 537 F.3d 755, 771 (7th Cir. 2008) (quoting Phelan v. Cook County, 463 F.3d 773, 779 (7th Cir. 2006)).  Examples of circumstantial evidence include, *inter alia*, "suspicious timing, ambiguous statements, behavior toward or comments directed at other employees in the directed group, and other bits and pieces from which an inference of discriminatory intent might be drawn."  Boumehdi v. Plastag Holdings, LLC, 489 F.3d 781, 792 (7th Cir. 2007) (citing Troupe v. May Dep't Stores Co., 20 F.3d 734, 736 (7th Cir. 1994)).

18

### A.      Statutorily Protected Activity

Mr. Hampton contends that he engaged in statutorily protected activity when in late November and early December of 2007 he complained about Ms. Golobish's behavior to Mr. Odendahl, Mr. Lewis, and the corporate hotline and in remarking that, had he grabbed a female employee like Ms. Golobish grabbed him, he would have been fired.  UPS rejoins that these complaints do not constitute statutorily protected activity because Mr. Hampton did not assert that he was subjected to discriminatory behavior that is unlawful under Title VII.

It is well-established under Seventh Circuit law that "[m]erely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient." Tomanovich v. City of Indianapolis, 457 F.3d 656, 663 (7th Cir. 2006) (citations omitted).  While an employee "need not use the magic words 'sex' or 'gender discrimination' to bring [his] speech within Title VII's retaliation protections, '[he] has to at least say something to indicate [his gender] is an issue."  Gates v. Caterpillar, Inc., 513 F.3d 680, 687 (7th Cir. 2008) (quoting Sitar v. Indiana Dep't of Transp., 344 F.3d 720, 727 (7th Cir. 2003)).  Thus, complaints of being singled out or "picked on" do not rise to the level of a protected activity unless an individual links the conduct to discrimination or being singled out on the basis of his being a member of a protected class.  Sitar, 344 F.3d at 727.

It is clear that Mr. Hampton's complaints regarding Ms. Golobish's treatment of

him (i.e., grabbing his arm and jerking him toward the door including his complaining about it afterwards) do not rise to the level of statutorily protected activity because Mr. Hampton merely remarked that her behavior violated the UPS's zero tolerance workplace violence policy, not that it was based on any characteristic protected under Title VII.  In fact, when he reported the behavior to Mr. Lewis, Mr. Hampton speculated that Ms. Golobish's alleged conduct was due to her perception that anyone who had been a part-time supervisor as long as Mr. Hampton had been without being promoted was "a loser." He never stated that Ms. Golobish's behavior was due in any way to his gender.  It is clear that UPS could not have inferred from these complaints that Mr. Hampton was complaining about behavior made unlawful by Title VII.

Alternatively, Mr. Hampton argues that he engaged in statutorily protected activity when, in response to Mr. Lewis stating that Ms. Golobish would not be terminated for her conduct, he complained that, had Ms. Golobish seen him (Hampton) "grabbing" one of his female subordinates and "jerking" her around the office as he alleged Ms. Golobish did to him, she would have immediately terminated him.  Mr. Hampton contends that he also made a similar statement when he called the company's corporate hotline.[11]  We are unable to conclude that these statements constitute statutorily protected activity.  Mr. Hampton did not report or complain about a perceived disparity in discipline that had

---

[11] There is no mention of any such comment in the report summarizing Mr. Hampton's complaint to the corporate hotline.  However, Mr. Hampton testified in his deposition that he was talking so fast that the operator missed some of the things that he said.  Nonetheless, at this stage in the litigation, we view the facts in the light most favorable to Mr. Hampton, as we are required to do.

*actually* occurred and which he believed was based on sex.  Rather, he merely *speculated* that Ms. Golobish would have terminated him had he engaged in similar behavior.  While informal complaints can in some cases constitute statutorily protected activity, in light of the off-handedness of Mr. Hampton's comment regarding his hunch that Ms. Golobish would have terminated him if he had done to a female employee what she had done to him, it is highly unlikely that a reasonable jury could find that Mr. Hampton's statements rise to the level of protected activity.  However, even if Mr. Hampton could demonstrate that he engaged in protected conduct, his retaliation claim nevertheless fails because he is unable to show that he was subjected to an adverse employment action, as more fully explained below.

### B.    Adverse Employment Action

"An 'adverse employment action' is an employment action that is likely to dissuade a reasonable worker from making or supporting a charge of discrimination." Matthews v. Wisconsin Energy Corp., 534 F.3d 547, 558 (7th Cir. 2008) (quoting Burlington N. and Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)).  The Seventh Circuit has made clear that "not everything that makes an employee unhappy will suffice to meet the adverse action requirement. . . . Rather, an employee must show that material harm has resulted from . . . the challenged actions." Traylor v. Brown, 295 F.3d 783, 788 (7th Cir. 2002) (internal quotations omitted).  In other words, the challenged action must result in some "significant change in employment status." Bell v. EPA, 232 F.3d 546,

555 (7th Cir. 2000) (citations omitted).  Examples of such material changes include "a

termination of employment, a demotion evidenced by a decrease in wage or salary, a less

distinguished title, a material loss of benefits, significantly diminished material

responsibilities, or other indices that might be unique to a particular situation."  de la

Rama v. Ill. Dep't of Human Servs., 541 F.3d 681, 685-86 (7th Cir. 2008) (quoting Oest

v. Ill. Dep't of Corr., 240 F.3d 605, 612-13 (7th Cir. 2001)).

Mr. Hampton contends he was subjected to the following adverse employment

actions: (1) being asked to switch his chosen vacation weeks on two occasions; and (2)

being assigned to work Saturday evenings for approximately eighteen months.  We

cannot conclude that either of these alleged acts of retaliation to which Mr. Hampton

contends he was subjected rises to the level of severity necessary to be considered adverse

employment actions.

### 1.    Vacation Weeks

Although it may have been (and likely was) an inconvenience for Mr. Hampton to

have been required to reschedule his vacation weeks, once in February 2007 and again in

2008,[12] it did not result in the loss of any of the vacation time to which he was entitled or

in the tangible loss of any other benefit.  Moreover, on one of those two occasions, three

other employees also received the email which requested that they reschedule their

---

[12] Mr. Hampton was also initially asked to switch a vacation week in July of 2007, but he
was ultimately allowed to keep his originally chosen week on that occasion.

chosen vacation dates to ensure that multiple management employees were not absent during the same week.  Thus, Mr. Hampton was not singled out for such treatment, even if it had been otherwise an adverse employment action.  In these circumstances, we are unable to find that being required on two occasions to shift the weeks selected for vacation, without any accompanying loss of vacation time, salary, or other benefits, rises to the level of an adverse employment action as contemplated by Title VII.  See, e.g., Griffin v. Potter, 356 F.3d 824, 829 (7th Cir. 2004) (denial of annual leave requests not an adverse employment action).

### 2.    Working Saturdays

Mr. Hampton also claims that Ms. Golobish retaliated against him by changing his shift so that he was required to work Saturday nights instead of Monday nights over an eighteen month period.  This change in working hours did not affect Mr. Hampton's rate of pay, benefits, position title, or promotion opportunities.  Under Seventh Circuit law, such a reassignment, without a corresponding change in compensation or career prospects, generally does not rise to the level of a materially adverse action.  E.g., Washington v. Ill. Dept. of Revenue, 420 F.3d 658, 662 (7th Cir. 2005) ("By and large a reassignment that does not affect pay or promotion opportunities lacks [the] potential to dissuade and thus is not actionable.").  However, Mr. Hampton contends that the Saturday night assignment was more than just an alteration of his work hours.  He claims that his Saturday night job duties were completely unrelated to his skills and training, and that,

although he was supposed to have Mondays off, he still received calls at home from the employees he supervised who asked him questions that his replacement could not answer. Additionally, he maintains that the shift change negatively impacted his family life and prevented him from driving a bus on weekends for another job.  We address each of these allegations in turn.

Mr. Hampton contends that the change in his schedule, which resulted in his having to work both Friday and Saturday nights, affected the time he was able to spend with his family.  However, under Seventh Circuit law, a shift change's impact on family life is generally irrelevant to the materially adverse analysis.  Grube v. Lau Indus., Inc., 257 F.3d 723, 729 (7th Cir. 2001) ("Title VII simply was never intended to be used as a vehicle for an employee to complain about the hours she is scheduled to work or the effect those hours have upon the time an employee spends with family members.").  One exception to this general rule is a case where an employee has a "unique vulnerability" of which the employer is aware and specifically targets in order to retaliate.  See Washington, 420 F.3d at 662.  For example, in Washington, despite knowing that the plaintiff was unable to work nine to five because of her son's medical condition, the defendant employer assigned the plaintiff those hours, which required her to use two hours of vacation and sick leave each day, effectively reducing her salary.  Id.  Mr. Hampton has presented no evidence of a similar vulnerability here that UPS sought to exploit, and thus, we do not find that the alleged impact on his family life elevates the shift change to a materially adverse employment action.

Nor does the fact that working Saturday nights interfered with Mr. Hampton's ability to work as a substitute bus driver make the schedule change materially adverse. Mr. Hampton contends that, while the shift change did not alter his salary from UPS, it effectively lowered his pay because it rendered him unable to work as a substitute bus driver on Saturdays. However, in his deposition, Mr. Hampton testified that he would only "occasionally" be called in to be a substitute bus driver, and that he does not work for the bus company "regularly or very often" and generally goes months in between jobs. Hampton Dep. at 277-78. For example, at the time of his deposition, he testified that he had not worked for the bus company in approximately four months. See id. at 278. In light of this testimony, we find that any impact the shift change may have had on Mr. Hampton's ability to accept work as a bus driver on Saturdays was de minimus.

Whether the alleged change in Mr. Hampton's job duties on Saturdays renders the shift change materially adverse is a closer question. Under Seventh Circuit law, "a *significant or substantial* change to an employee's responsibilities may be materially adverse, but every reassignment is not automatically actionable." Stephens v. Erickson, 569 F.3d 779, 790 (7th Cir. 2009) (citing Burlington N., 548 U.S. at 71) (emphasis added). Here, Mr. Hampton contends that the work he was asked to perform on Saturdays did not utilize his skills or expertise as a part-time supervisor, but rather included menial tasks such as locking up the building. This change had no effect on the duties he performed the rest of the work week, however. Mr. Hampton only had to perform altered job duties on one out of the five days he worked for UPS each week.

25

Thus, he still performed his supervisory duties the vast majority of the time that he worked and he did not suffer a decrease in pay, benefits, or future job prospects due to his Saturday assignment. Moreover, the Saturday job duties were specific to that shift and needed to be performed by some UPS employee. On the occasions that one of the full-time supervisors filled in for Mr. Hampton on Saturday evenings when he had a scheduling conflict, that supervisor was required to perform the same duties, despite being even higher on the chain of command than Mr. Hampton. In light of these facts, we are unable to find Mr. Hampton's altered job duties relating to his Saturday shifts to be a change sufficiently significant to dissuade a reasonable employee from filing a charge of discrimination.

Mr. Hampton's claim that the Saturday schedule resulted in increased work for which he did not receive compensation is also unavailing. According to Mr. Hampton, when he worked Saturdays, he received telephone calls at home on Mondays (his day off) from the employees he supervised with questions that the employee who replaced Mr. Hampton on Mondays could not answer. However, Mr. Hampton has presented no evidence that any supervisor at UPS knew about the calls he allegedly received or intended for them to occur. Because Mr. Hampton has not shown that his employer was aware of the calls, their existence cannot be used to support his retaliation claim. Washington, 420 F.3d at 663 ("An employer that is oblivious to the costs its decisions create cannot be using these costs to retaliate.").

For the foregoing reasons, we find that Mr. Hampton has failed to satisfy the

second prong of the direct method test, to wit, that he was subjected to an adverse

employment action.  Accordingly, we <u>GRANT</u> Defendant's Motion for Summary

Judgment.


**III.    Conclusion**

For the foregoing reasons, we <u>DENY</u> Plaintiff's Motion to Strike and <u>GRANT</u>

Defendant's Motion for Summary Judgment.  Final judgment shall enter accordingly.

IT IS SO ORDERED.



Date:  ___02/12/2010_____

                                                        _____
                                                        SARAH EVANS BARKER, JUDGE
                                                        United States District Court
                                                        Southern District of Indiana

Copies to:

Gary R. Clark
QUARLES & BRADY, LLP
gary.clark@quarles.com

John H. Haskin
HASKIN LAUTER  & LARUE
jhaskin@hlllaw.com

John Allen Klages
QUARLES & BRADY LLC
john.klages@quarles.com

Jay  Meisenhelder
HASKIN LAUTER  & LARUE
jmeisenhelder@hlllaw.com

Meghan E. Riley
QUARLES & BRADY LLP
meriley@quarles.com